**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

CASSANDRA WILSON, and all other individuals similarly situated,
*Plaintiff-Appellant*,

v.

THEODORE F. CRAVER; ROBERT BOADA,
*Defendants-Appellees.*

No. 18-56139

D.C. No.
2:15-cv-09139-
JAK-PJW

OPINION

Appeal from the United States District Court
for the Central District of California
John A. Kronstadt, District Judge, Presiding

Argued and Submitted February 8, 2021
Pasadena, California

Filed April 19, 2021

Before:  A. Wallace Tashima, Milan D. Smith, Jr., and
Mary H. Murguia, Circuit Judges.

Opinion by Judge Murguia

## SUMMARY[*]

**Employee Retirement Income Security Act**

The panel affirmed the district court's dismissal of an action alleging breach of fiduciary duty under the Employee Retirement Income Security Act in the management of the assets of a pension plan.

An employee of Edison International, Inc., alleged that fiduciaries of Edison's employee stock ownership plan breached their duty of prudence by allowing employees to continue to invest in Edison stock after learning that the stock was artificially inflated.

The panel held that the plaintiff failed to state a duty-of-prudence claim under the *Fifth Third* standard because she failed plausibly to allege an alternative action so clearly beneficial that a prudent fiduciary could not conclude that it would be more likely to harm the fund than to help it. Agreeing with other Circuits, and distinguishing a Second Circuit case, the panel held that general economic principles are not enough on their own to plead duty-of-prudence violations.

## COUNSEL

Samuel E. Bonderoff (argued), Zamansky LLC, New York, New York, for Plaintiff-Appellant.

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

John M. Gildersleeve (argued), Henry Weissman, and Lauren C. Barnett, Munger Tolles & Olson LLP, Los Angeles, California, for Defendants-Appellees.

**OPINION**

MURGUIA, Circuit Judge:

The Employee Retirement Income Security Act of 1974, as amended ("ERISA"), requires the fiduciary of a pension plan to act prudently in managing the plan's assets. 29 U.S.C. § 1104(a)(1)(B). This case focuses on that duty of prudence as applied to the fiduciary of an employee stock ownership plan ("ESOP")—a type of pension plan that invests primarily in the stock of the company that employs the plan participants. We must determine if the operative complaint plausibly alleges a duty-of-prudence claim against certain ESOP fiduciaries in accordance with the context-specific pleading standard announced in *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 428 (2014), which requires that the plaintiff "plausibly allege an alternative action that the defendant could have taken that would have been consistent with the securities laws and that a prudent fiduciary in the same circumstances would not have viewed as more likely to harm the fund than to help it."

Plaintiff-Appellant Cassandra Wilson, an Edison International Inc. ("Edison") employee, brought this putative class action against two Edison executives who are fiduciaries of Edison's 401(k) ESOP plan. Plaintiff alleges that Defendant Fiduciary Boada breached his duty of prudence by allowing employees to continue to invest in Edison stock after he learned that the Edison stock was artificially inflated. But as noted, to state a duty-of-prudence

claim against an ESOP fiduciary under *Fifth Third*, a plaintiff must plausibly allege an alternative action so clearly beneficial that a prudent fiduciary could not conclude that it would be more likely to harm the fund than to help it. *See* 573 U.S. at 428–29. The district court dismissed Plaintiff's claims, concluding that Plaintiff failed plausibly to allege the requisite alternative action. We affirm.

## I. Background

Edison is the parent company of Southern California Edison Company ("SCE"), which supplies electricity to much of Southern California. Eligible employees of SCE, Edison, and other subsidiaries of Edison may participate in a defined contribution plan, the Edison 401(k) Savings Plan (the "Plan"), by diverting a percentage of their earnings to be invested in funds offered by the Plan. One fund option available to Plan participants was the Edison Company Stock Fund (the "Stock Fund"). The Stock Fund is an ESOP that primarily holds Edison common stock. Stock Fund options are chosen by Edison's Trust Investment Committee. Theodore Craver, Edison's CEO at all relevant times, appointed the Trust Investment Committee's members, which included Robert Boada, Edison's Vice President and Treasurer. Craver and Boada are the defendant fiduciaries in this action (collectively "Defendants").

Plaintiff alleges that Defendants breached their duty of prudence because they knew that undisclosed misrepresentations were artificially inflating Edison's stock price, yet they took no action to protect the Plan participants from the foreseeable harm that inevitably results when fraud is revealed to the market. The alleged misrepresentations concerned SCE's failure to disclose certain *ex parte* communications between SCE executives and California

Public Utilities Commission ("CPUC") decision-makers that occurred while the CPUC was overseeing SCE's rate-setting proceedings and settlement negotiations with ratepayer advocacy groups. The failure to disclose these communications was material to the market because once revealed, the *ex parte* communications called the highly anticipated settlement between SCE and the ratepayer advocacy groups into question.

## A. The *ex parte* communications

In 2013, SCE, which provides utilities to nearly 14 million people in Central and Southern California, closed one of its power plants—the San Onofre Nuclear Generating Station ("SONGS")—due to generator failure. As a result of the plant closure, SCE participated in rate-setting proceedings before the CPUC to determine how costs associated with the closure should be allocated between SCE (and its shareholders), on the one hand, and SCE's ratepayers, on the other. Edison—SCE's parent company—announced that a settlement had been reached with the ratepayer advocacy groups in March 2014 ("SONGS Settlement"), subject to the CPUC's approval. The CPUC approved the SONGS Settlement in November 2014.

Under the CPUC's rules, while the SONGS proceedings were ongoing, SCE was required to file a notice whenever an SCE employee interacted privately with a CPUC official if the interaction concerned any substantive issue in the SONGS proceedings. In February 2015, two months after the SONGS Settlement was approved, SCE filed a notice with the CPUC that an SCE employee had engaged in an *ex parte* communication in March 2013—after the SONGS proceedings had commenced but before settlement negotiations had begun—at an industry conference in Warsaw, Poland (the "Warsaw communication"). As a

result of the disclosure, some of the intervening ratepayer advocacy groups that were parties to the SONGS Settlement requested the CPUC investigate whether sanctions should be imposed on SCE in connection with the *ex parte* communication and urged the CPUC to set aside or modify the SONGS Settlement. The subsequent investigation revealed additional non-reported *ex parte* communications, inciting further frustration among the advocacy groups that were parties to the SONGS Settlement. In August 2015, an Administrative Law Judge ("ALJ") overseeing the CPUC investigation issued a ruling finding that SCE failed to report ten *ex parte* communications.[1] In December 2015, the full five-member CPUC issued its own ruling modifying in part and affirming in part the ALJ's ruling.[2] The CPUC concluded that SCE failed to report eight qualifying communications, justifying a penalty of $16.7 million.

## B.  Edison's stock price

Edison's stock price appreciated substantially after the SONGS Settlement was first announced in March 2014, rising from $49 per share to $54 per share in one week. The stock price continued to rise after the CPUC approved the SONGS Settlement in November 2014, rising to over $67 per share in early 2015. The stock price began to decline, however, when news that SCE executives had engaged in improper *ex parte* communications with CPUC decisionmakers came to light. Plaintiff claims that Edison's stock price depreciated fifteen percent as the truth of the *ex*

---

[1] One ratepayer advocacy group contended that there were "more than 70" reporting violations.

[2] The CPUC decision is not mentioned in the Second Amended Complaint but is the proper subject of judicial notice. *See*. Fed. R. Evid. 201(b).

*parte* communications slowly emerged over a series of partial disclosures. The first alleged disclosure was the February 2015 notice of the Warsaw communication, followed by news reports of additional *ex parte* communications that were revealed through the subsequent investigation. The final disclosure was a June 24, 2015 application by one of the interested ratepayer advocacy groups to charge SCE with "fraud by concealment," which confirmed fears that the SONGS Settlement was in jeopardy.

## C. The Second Amended Complaint

On November 24, 2015, before the CPUC's final ruling, Plaintiff filed this putative class action against Defendants on behalf of herself and all Plan participants that purchased or held the Edison Company Stock Fund during the Class Period—between March 27, 2014 (when the SONGS Settlement was announced) and June 24, 2015 (the final partial disclosure revealing the fraud to the market). She alleged that as a member of the Trust Investment Committee, Defendant Boada had a fiduciary duty to ensure the continued prudence of all Plan participants' investments, including in the Stock Fund. She further alleged that as the person responsible for overseeing the Trust Investment Committee, Defendant Craver had a fiduciary duty to monitor Defendant Boada and ensure he was fulfilling his fiduciary obligations. Plaintiff alleges that Boada breached his duty of prudence by failing promptly to disclose the *ex parte* communications, which would have allowed the Company's stock price to correct and mitigated the harm suffered by Plan participants. Derivatively, Plaintiff alleges that Defendant Craver breached his duty by failing to ensure Defendant Boada took corrective action. The district court dismissed Plaintiff's first two complaints without prejudice. The district court later dismissed the operative Second

Amended Complaint ("SAC"), concluding that it failed to satisfy the pleading standard for ESOP duty-of-prudence claims set forth in *Fifth Third*, 573 U.S. 409.**[3]**  This appeal followed.

## II.  Standard of Review

We review a district court's dismissal of a complaint de novo.  *See Dowers v. Nationstar Mortg., LLC*, 852 F.3d 964, 969 (9th Cir. 2017).  The Court is obliged to "accept[] all factual allegations in the complaint as true and constru[e] them in the light most favorable to the [plaintiff]." *Skilstaf, Inc. v. CVS Caremark Corp.*, 669 F.3d 1005, 1014 (9th Cir. 2012).   However, we need not accept as true legal conclusions couched as factual allegations.  *Ashcroft v. Iqbal*, 556 U.S. 662, 680–81 (2009).

## III.    Discussion

The sole issue on appeal is whether Plaintiff plausibly alleged a duty-of-prudence claim under the pleading standard announced in *Fifth Third*, 573 U.S. 409.  Plaintiff makes two primary objections to the district court's application of the *Fifth Third* pleading standard.  First, she contends that the district court's application makes it impossible to plead duty-of-prudence claims.  Second, she asserts that the allegations in the SAC are analogous to the allegations in *Jander v. Ret. Plans Comm. of IBM*, 910 F.3d 620, 632 (2d Cir. 2018), *vacated and remanded*, 140 S. Ct. 592 (2020), *reinstated*, 962 F.3d 85, *cert. denied sub nom. Ret. Plans Comm. v. Jander*, No. 20-289, 2020 WL 6551787

---

**[3]** The district court dismissed the SAC with leave to amend but Plaintiff elected not to file an amended complaint.  Judgment was entered on August 3, 2018.

(U.S. Nov. 9, 2020), which in Plaintiff's view is the only decision to correctly apply *Fifth Third.* Accordingly, a brief discussion of the Supreme Court's decision in *Fifth Third* is instructive.

### A. *Fifth Third Bancorp v. Dudenhoeffer*

*Fifth Third* set forth the pleading standard applicable to ESOP duty-of-prudence claims. As ERISA fiduciaries, Defendants were required to manage the Plan with "care, skill, prudence, and diligence." 29 U.S.C. § 1104(a)(1)(B); *see Fifth Third*, 573 U.S. at 418–19. But prior to the Supreme Court's decision in *Fifth Third*, many circuit courts of appeals, including this one, had determined that ESOP fiduciaries were entitled to a presumption that their fund management was prudent.[4] The presumption was developed as a means to reconcile an ESOP fiduciary's duty of prudence with an ESOP fiduciary's obligation to invest primarily in the stock of the Plan participants' employer and Congress's stated interest in encouraging the use of ESOPs. *Fifth Third*, 573 U.S. at 415–16. The presumption was "generally defined as a requirement that the plaintiff make a showing that would not be required in an ordinary duty-of-prudence case, such as that the employer was on the brink of collapse." *Id.* at 412.

In *Fifth Third*, the Supreme Court rejected the presumption of prudence and held that "the same standard of

---

[4] *See Quan v. Comput. Scis. Corp.*, 623 F.3d 870, 881 (9th Cir. 2010); *see also White v.Marshall & Ilsley Corp.*, 714 F.3d 980, 990 (7th Cir. 2013); *Lanfear v. Home Depot, Inc.*, 679 F.3d 1267, 1280 (11th Cir. 2012); *In re Citigroup ERISA Litig.*, 662 F.3d 128, 137 (2d Cir. 2011); *Kirschbaum v. Reliant Energy, Inc.*, 526 F.3d 243, 254 (5th Cir. 2008); *Kuper v. Iovenko*, 66 F.3d 1447, 1459 (6th Cir. 1995); *Moench v. Robertson*, 62 F.3d 553, 571 (3d Cir. 1995).

prudence applies to all ERISA fiduciaries, including ESOP fiduciaries, except that an ESOP fiduciary is under no duty to diversify the ESOP's holdings." *Id.* at 418–19. In other words, ESOP fiduciaries are subject to the same duty of prudence as all other ERISA fiduciaries and are not entitled to any special presumption.

The Supreme Court, however, recognized that absent the presumption of prudence, ESOP fiduciaries may face excessive litigation. *Id.* at 423–24. For example, because ESOP fiduciaries are often company insiders, they are frequently alleged, as they are here, to have inside information that their company's stock is overpriced. Normally, a prudent investor that knew one of its investments was imprudent would stop buying the imprudent stock and divest the fund of its imprudent holdings, but such action would conflict with the legal prohibition on insider trading whenever the fiduciary's knowledge that the stock is imprudent stems from inside information. The Supreme Court described this conflict as a legitimate concern. *Id.* at 423. Similarly, the Court recognized that because ESOP plans instruct their fiduciaries to invest in company stock and ERISA requires fiduciaries to follow plan documents, *see* 29 U.S.C. § 1104(a)(1)(D), "an ESOP fiduciary who fears that continuing to invest in company stock may be imprudent finds himself between a rock and a hard place." *Id.* at 424. The Supreme Court illustrated this conflict by explaining that: "If [the ESOP fiduciary] keeps investing and the stock price goes down he may be sued for acting imprudently in violation of § 1104(a)(1)(B), but if he stops investing and the stock price goes up he may be sued for disobeying the plan documents in violation of § 1104(a)(1)(D)." *Id.*

In light of these considerations, the Supreme Court endeavored to balance Congress's stated interest in encouraging the creation of ESOPs with the right of plan participants to enforce their rights under a plan. *Id.* The Court determined that the presumption of prudence, which made it "impossible for a plaintiff to state a duty-of-prudence claim, no matter how meritorious, unless the employer is in very bad economic circumstances," was not "an appropriate way to weed out meritless lawsuits or to provide the requisite 'balancing.'" *Id.* at 425. Rather, the Court determined that this "important task can be better accomplished through careful, context-sensitive scrutiny of a complaint's allegations." *Id.*

Accordingly, the Supreme Court announced:

> To state a claim for breach of the duty of prudence on the basis of inside information, a plaintiff must plausibly allege an alternative action that the defendant could have taken that would have been consistent with the securities laws and that a prudent fiduciary in the same circumstances would not have viewed as more likely to harm the fund than to help it.

*Id.* at 428. As guidance, the Court highlighted three points that "inform the requisite analysis." *Id.* First, "courts must bear in mind that the duty of prudence . . . does not require a fiduciary to break the law." *Id.* Therefore, ERISA's duty of prudence "cannot not require an ESOP fiduciary to perform an action—such as divesting the fund's holdings of the employer's stock on the basis of inside information—that would violate the securities laws." *Id.* Second, "courts should consider the extent to which an ERISA-based

obligation either to refrain on the basis of inside information from making a planned trade or to disclose inside information to the public could conflict with the complex insider trading and corporate disclosure requirements." *Id.* at 429. Third, the Supreme Court instructed:

> [L]ower courts faced with such claims should also consider whether the complaint has plausibly alleged that a prudent fiduciary in the defendant's position could not have concluded that stopping purchases—which the market might take as a sign that insider fiduciaries viewed the employer's stock as a bad investment—or publicly disclosing negative information would do more harm than good to the fund by causing a drop in the stock price and a concomitant drop in the value of the stock already held by the fund.

*Id.* at 429–30; *see Amgen Inc. v. Harris*, 136 S. Ct. 758, 760 (2016) (per curiam) (reiterating that courts must assess "whether the complaint in its current form 'has plausibly alleged' that a prudent fiduciary in the same position 'could not have concluded' that the alternative action 'would do more harm than good'") (quoting *Fifth Third*, 573 U.S. at 429–30). Determining whether a plaintiff has met this pleading standard is a context-specific inquiry, focused on "the circumstances . . . prevailing" at the time the fiduciary acts. *Fifth Third*, 573 U.S. at 425 (alterations in original) (quoting 29 U.S.C. § 1104(a)(1)(B)).

## B. Applying the "more harm than good" standard

Plaintiff contends that in concluding the SAC failed to satisfy *Fifth Third*, the district court "brushed right past the majority of the [*Fifth Third*] opinion," which flatly rejected

the presumption of prudence that made it impossible for a plaintiff to state a duty-of-prudence-claim, only to apply the newly announced standard in a manner that similarly makes it impossible to state a duty-of-prudence claim. Plaintiff argues that the district court incorrectly concluded that whenever the plaintiff's proposed alternative action—in this case an immediate comprehensive corrective disclosure—would result in a decline in the stock price, the *Fifth Third* standard is not met because a prudent fiduciary could conclude that such actions would do more harm than good. We agree that such a per se rule would effectively bar nearly all duty-of-prudence claims that are based on inside information, because, as Plaintiff points out, the only way to cure artificial inflation is to make a corrective disclosure, which always results in a drop in the company's stock price. In *Fifth Third*, the Supreme Court expressly rejected the presumption of prudence, in large part because the presumption made it "impossible for a plaintiff to state a duty-of-prudence claim, no matter how meritorious." 573 U.S. at 425. Therefore, any application of the *Fifth Third* pleading standard that makes it "impossible for a plaintiff to state a duty-of-prudence claim, no matter how meritorious" cannot be correct.

Plaintiff's assertion that the district court applied such an impossible standard, however, mischaracterizes the district court's order. The district court did not hold that Plaintiff failed to state a duty-of-prudence claim solely because the proposed alternative—a corrective disclosure—would have caused a drop in Edison's stock price. Rather, it concluded that Plaintiff's SAC failed to include context-specific allegations plausibly explaining why a prudent fiduciary in Defendants' position "could not have concluded" that a corrective disclosure would do more harm than good to the Stock Fund. Instead, the district court concluded that

Plaintiff relied on wholly conclusory allegations "framed in a manner that could apply to any similar ERISA claim."

Plaintiff's SAC primarily relies on the theory that no reasonable fiduciary could have thought that disclosing the truth of the *ex parte* communications would do more harm than good to the Plan because throughout the Class Period the stock price was continually rising and "key metrics reflecting the underlying risk and volatility of Edison stock indicated that the risk was increasing." Therefore, "[a] prudent fiduciary trying to determine whether and when to make corrective disclosure would have recognized that, given the increasing volatility underlying Edison [stock and the trending rise in Edison's stock price] . . . the longer that corrective disclosure [was] delayed, the greater the negative price impact would be once disclosure finally occurred." Plaintiff also alleged that Defendants should have "understood that, the longer Edison's fraud went on, the more damage would be done to [Edison's] reputation when the truth emerged." But nearly every court to consider duty-of-prudence claims post *Fifth-Third* has rejected the notion that general economic principles, such as those Plaintiff relied on, are enough on their own to plead duty-of-prudence violations. *See, e.g.*, *Allen v. Wells Fargo & Co.*, 967 F.3d 767, 774 (8th Cir. 2020) ("[W]e find Appellants' allegation based on general economic principles—that the longer a fraud is concealed, the greater the harm to the company's reputation and stock price—is too generic to meet the requisite pleading standard."), *pet. for cert. filed*, No. 20-866 (U.S. Dec. 30, 2020); *Martone v. Robb*, 902 F.3d 519, 526–27 (5th Cir. 2018) (holding that allegations based on the general economic trend that "the longer the fraud persists, the harsher the correction tends to be" are insufficient to satisfy *Fifth Third*); *Graham v. Fearon*, 721 F. App'x 429,

436–37 (6th Cir. 2018) (same); *Loeza v. John Does 1–10*, 659 F. App'x 44, 45–46 (2d Cir. 2016) (same).

This consensus is consistent with *Fifth Third*'s call for context-specific allegations and the Supreme Court's stated intent to provide some protection from meritless claims. Notably, if all that is required to plead a duty-of-prudence claim is recitation of generic economic principles that apply in every ERISA action, every claim, regardless of merit, would go forward. Accordingly, we join our sister circuits in concluding that the recitation of generic economic principles, without more, is not enough to plead a duty-of prudence violation. To be clear, we do not hold that district courts should not consider allegations reciting general economic principles. *See Jander*, 910 F.3d at 629 ("While these economic analyses will usually not be enough on their own to plead a duty-of-prudence violation, they may be considered as part of the overall picture."); *see also Allen*, 967 F.3d at 774 (considering general economic principles as "part of the overall picture") (citation omitted).[5] But where general economic principles are alleged, the complaint must also include context-specific allegations explaining why an earlier disclosure was so clearly beneficial that a prudent fiduciary could not conclude that it would be more likely to

---

[5] This notion is consistent with the legal standard applicable to motions to dismiss. *Iqbal*, 556 U.S. at 679 (explaining that "legal conclusions can provide the framework of a complaint, [but] they must be supported by factual allegations"); *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1058 (9th Cir. 2014) ("Although we examine individual allegations in order to benchmark whether they are actionable, we consider the allegations collectively and examine the complaint as a whole.").

harm the fund than help it.**[6]**  The district court did not err in requiring the same.

## C. *Jander v. Ret. Plans Comm. of IBM*

Only one case post-*Fifth Third* has reversed the dismissal of a duty-of-prudence claim in the ESOP context, *Jander v. Ret. Plans Comm. of IBM*, 910 F.3d 620, 632 (2d Cir. 2018). Plaintiff urges us to conclude the allegations in the SAC are similarly sufficient to survive a motion to dismiss. Assuming the allegations in *Jander* plausibly alleged a duty-of-prudence claim under *Fifth Third*, the SAC in the instant case lacks the pertinent context-specific allegations that rendered the complaint in *Jander* sufficient.

In *Jander*, the plan participants alleged that their employer, while eliciting buyers for a portion of its business, failed to disclose losses the business was set to incur and overvalued the business to the market.  *Jander*, 910 F.3d at 623.  Once a buyer was found and the terms of the sale were announced, the prior misrepresentation regarding the

---

**[6]** Plaintiff's assertion that Defendants should have assumed Edison's stock price and implied volatility would continue to rise is misplaced and does not provide the context-specific facts needed to allege why an earlier disclosure was so clearly beneficial that a prudent fiduciary could not have concluded that it would be more likely to harm the fund than help it.  ERISA fiduciaries are not expected to predict the future of the company's stock performance.  *See Fifth Third*, 573 U.S. at 427 ("Fiduciaries are not expected to predict the future of the company's stock performance.") (quoting *Quan v. Comput. Scis. Corp.*, 623 F.3d 870, 881 (9th Cir. 2010)); *Rinehart v. Lehman Bros. Holdings Inc.*, 817 F.3d 56, 63–64 (2d Cir. 2016) (explaining ERISA's duty of prudence requires "prudence, not prescience") (citation omitted).  And the relevant context "turns on 'the circumstances . . . prevailing' at the time the fiduciary acts."  *Fifth Third*, 573 U.S. at 425 (alteration in original) (quoting 29 U.S.C. § 1104(a)(1)(B)).

business's value was revealed to the market and the employer's stock price declined. Plan participants alleged that once the plan fiduciaries learned the employer's stock price was artificially inflated, they should have disclosed the truth. *Id.*

The Second Circuit concluded that the complaint sufficiently alleged a duty-of-prudence claim and highlighted five allegations that rendered the complaint sufficient: (1) the fiduciaries knew the employer's stock "was artificially inflated"; (2) the fiduciaries "had the power to disclose the truth to the public [and] correct the artificial inflation"; (3) the failure "promptly to disclose" the fraud hurt the company's "credibility . . . because the eventual disclosure of a prolonged fraud causes reputational damage that increases the longer the fraud goes on";[7] (4) the company's "stock traded in an efficient market", reducing the risk of an "irrational overreaction to the disclosure of fraud"; and (5) the fiduciaries "knew that disclosure of the truth . . . was inevitable because [the employer] was likely to sell the business and would be unable to hide its overvaluation from the public at that point." *Id.* at 628–30 (citations and internal quotation marks omitted). The Second Circuit placed special emphasis on the fifth allegation, describing it as "particularly important" because it distinguished *Jander* from "the normal case." *Id.* at 630. As the Second Circuit explained, in "the normal case, when

---

[7] Notably, the Second Circuit explained that the complaint's reference to reputational harm—a generic economic theory—was relevant only because the complaint had already established in a fact-specific manner that no further investigation was needed to ensure disclosure would not have been premature. *Id.* at 629–30. This application is consistent with the Second Circuit's determination that generic economic theories are relevant as part of the overall picture, but insufficient on their own—a determination we adopt in Part III.B above.

the prudent fiduciary asks whether disclosure would do more harm than good, the fiduciary is making a comparison only to the status quo of non-disclosure," but in *Jander* the inevitability of the truth coming to light forced "the prudent fiduciary . . . to compare the benefits and costs of earlier disclosure to those of later disclosure." *Id.* This latter comparison, coupled with the general economic theory that later disclosure is more harmful, allowed the plaintiffs sufficiently to plead "that no prudent fiduciary in the Plan defendants' position could have concluded that earlier disclosure would do more harm than good." *Id.* at 631.

Although the SAC contains some of the same allegations as the complaint in *Jander*, it is devoid of the "particularly important" allegations that distinguished the allegations in *Jander* from the "normal case." For instance, even assuming the SAC plausibly alleged Defendants knew that disclosure of the *ex parte* communications was inevitable, the signs of inevitability alleged in the SAC—including surfacing press reports and a government investigation—did not begin to surface until February 2015, after Edison's stock price had peaked. Therefore, even if Defendants fully disclosed the *ex parte* communications once it appeared "inevitable" that the information would become public according to Plaintiff's allegations, it likely would have been too late to benefit the Plan participants by mitigating the correction. Accordingly, it is far less likely that a corrective disclosure was so clearly beneficial at that time that a prudent fiduciary in Defendants' positions could not have concluded that it would be more likely to harm the fund than to help it.

Moreover, Plaintiff's contention that a prudent fiduciary in Defendants' positions would have made a prompt corrective disclosure assumes that Defendants had enough information during the class period to fully disclose the

number of *ex parte* communications that constituted violations of the CPUC's reporting rules, which is not clear in light of the confusion surrounding the application of the reporting rules. Even the CPUC acknowledged this confusion when it explained in its order that SCE's argument "that it could hardly be expected to know whether these communications fit the definition of *ex parte* communications . . . is not entirely without weight."[8] Due to the nature of the concealed information in *Jander*—a failure to disclose known losses—it was clear no further investigation was needed to permit a comprehensive corrective disclosure. The same is not true here, because it was unclear until after the Class Period closed how many CPUC rule violations, if any, SCE actually committed. *See Allen*, 967 F.3d at 774–75 (holding that where the complaint alleged an investigation was in process during the Class Period, "a prudent fiduciary—even one who knows disclosure is inevitable and that earlier disclosure may ameliorate some harm to the company's stock price and reputation—could readily conclude that it would do more harm than good to disclose information about [Defendant's] sales practices prior to the completion of the [] investigation"). Plaintiff even concedes that "where more

---

[8] We are not required to "accept as true allegations that contradict matters properly subject to judicial notice." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (citation omitted); *see Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010) (same). Therefore, to the extent the SAC alleges Defendants knew of the *ex parte* communications and knew the communications violated the CPUC's reporting rules such that Defendants were capable of making a comprehensive disclosure, we need not accept those allegations as true because they conflict with the text of the CPUC's decision noting ambiguity in the rules and the judicially noticeable fact that the ALJ and CPUC reached different conclusions as to how many reporting violations there were.

investigation of the underlying issue is called for, premature disclosure could be a mistake and lead to an unnecessary diminution of a company's stock price." Therefore, the district court correctly determined that because the SAC does not allege a "prudent fiduciary could not have concluded that deferring a disclosure until after the completion of investigations into the nature of the alleged fraud or the degree to which the alleged fraud affected the stock price would cause more harm than good," Plaintiff's allegations are deficient, even under *Jander*. Accordingly, Plaintiff's proposed alternative of an early comprehensive disclosure does not satisfy the "more harm than good" test announced in *Fifth Third*.

## IV.    Conclusion

We conclude that the district court properly determined that Plaintiff Wilson failed plausibly to plead that a prudent fiduciary in Defendants' position could not have concluded that Plaintiff's proposed alternative action of issuing a corrective disclosure would do more harm than good. The SAC relies solely on general economic theories and is devoid of context-specific allegations explaining why an earlier disclosure was so clearly beneficial that a prudent fiduciary could not conclude that disclosure would be more likely to harm the fund than to help it. Therefore, Plaintiff failed to state a claim for breach of the duty of prudence consistent with the standard announced in *Fifth Third*. As a result, the derivative monitoring claim alleged against Defendant Craver also fails.

**AFFIRMED.**